IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
NORTHEASTERN DIVISION

FILED
98 JAN 30 PM 4:42
U.S. DISTRICT COURT
N.D. OF ALABAMA

BARRY LYNN HALL )
)
      Plaintiff )
)
vs. ) CASE NO. CV96-S-0822-NE
)
JOE W. WHISANTE, et al., )
)
      Defendants )

ENTERED
JAN 30 1998

### MEMORANDUM OPINION

    Plaintiff, Barry Lynn Hall, has submitted a complaint pursuant to 42 U.S.C. § 1983. He names as defendants Madison County Sheriff Joe W. Whisante, Nurse Ann King, and Dr. Joe Sharp.[1] In accordance with the practices of this court, defendants were ordered to submit a special report responding to plaintiff's allegations. Defendants' special report was accompanied by affidavits and exhibits, and was construed to be a motion for summary judgment. Plaintiff was informed of the provisions of Rule 56, Fed.R.Civ.P., and afforded the opportunity to submit opposition. To date, plaintiff has filed no response to the motion for summary judgment.

    Hall alleges that defendant Whisante is responsible for the care, health, safety, and well being of inmates housed in the Madison County Jail. He alleges generally that Whisante's failure to provide

---

[1] Plaintiff also named as defendants Detention Officers Church and McCulley and inmate Don Crafts. Copies of the Order for Special Report mailed to these defendants at the addresses provided by plaintiff were returned to the court with the notations "return to sender--not here." Plaintiff was ordered to provide the court with updated addresses for these defendants. When plaintiff failed to comply with the order, defendants Church, McCulley, and Crafts were dismissed without prejudice from this action by order entered October 30, 1996.

adequate protection or safety resulted in injury to Hall by another inmate. Specifically, Hall alleges that on March 6, 1996, he was speaking with inmate Don Crafts in the area in front of the officers' cubicle at Madison County Jail Annex 2. Without warning, Crafts grabbed Hall at the base of his neck by his hair and pulled him up from his chair, while screaming that he was a federal marshal assigned to apprehend Hall. The officers from the cubicle subdued Crafts. Plaintiff alleges that Crafts was known by jail officials to be mentally unbalanced and should not have been placed in the jail annex.

Hall alleges that after the incident with Crafts, he began experiencing stiffness and pain in his lower back. He filled out a nurse request slip and was taken to see Nurse King. He avers Nurse King performed a physical examination, told him he would recover in time, and gave him Ibuprofen[2] for pain. Plaintiff avers that he was seen on a number of occasions thereafter by Nurse King and Dr. Sharp for his complaints of back and neck pain and stiffness, headaches, and occasional numbness in his legs. Diagnostic tests, including x-rays and an MRI scan, were performed and different medications prescribed for plaintiff. Plaintiff alleges that Nurse King and Dr. Sharp provided inadequate medical care for treatment of his complaints of pain. He also states that the medication provided by Nurse King and Dr. Sharp was ineffective in controlling or alleviating his pain.

Defendant Whisante contends that plaintiff's claims against him are due to be dismissed because they are based on the theory of *respondeat superior*. He avers plaintiff has not alleged his direct involvement in any of the events made the basis of this lawsuit. Defendants Dr. Sharp and Nurse King assert that they have provided constitutionally adequate medical care to Hall and that his

---

[2] Ibuprofen is a pain reliever prescribed for the temporary relief of minor aches and pains associated with, *inter alia*, muscle aches and back ache. *Physicians' Desk Reference*, 46th Ed. (1992).

2

complaint amounts to nothing more than a disagreement with the diagnosis and course of treatment prescribed.

The affidavits and exhibits submitted by defendants show that plaintiff was incarcerated in the Madison County Jail Annex on January 12, 1996, on two counts of burglary in the third degree. On October 8, 1996, Hall pled guilty to two counts of burglary in the third degree and was sentenced to concurrent 30-year terms of imprisonment. He was transferred to the custody of the Alabama Department of Corrections on October 21, 1996. Nurse King first examined Hall on January 17, 1996, at which time he reported that several months before, he had injured his back lifting a heavy object and had undergone therapy. Nurse King gave Hall a muscle relaxer and instructed him to have his family make a doctor's appointment for him. It appears that Hall's family did not make a doctor's appointment for him. On February 23, 1996, Hall complained to Nurse King that he had been unable to sleep for two to three months and was experiencing a back ache and headaches. On February 28, Hall again complained of headaches as well as itching and asked to be moved to Annex 2. Nurse King instructed corrections officers to dispense Tylenol to plaintiff. On March 7, a day after the incident with Crafts, Hall was seen by Nurse King with complaints of pain in his middle back, upper shoulder, and neck. At Dr. Sharp's instruction, King prescribed 800 milligrams of Ibuprofen three times a day for five days. On March 11, Hall reported to Nurse King that the Ibuprofen was ineffective, and he continued to experience pain in his back, shoulder, and neck. Dr. Sharp instructed King to dispense Parafon Forte[3] and Naprosyn.[4]

---

[3] Parafon Forte is prescribed for relief of discomfort associated with acute, painful musculoskeletal conditions. *Id.*

[4] Naprosyn is a nonsteroidal anti-inflammatory analgesic prescribed for the relief of mild to moderate pain. *Id.*

3

On March 20, 1996, plaintiff was examined by Dr. Sharp. Dr. Sharp detected mild spasms in plaintiff's back muscles and prescribed continuing treatment with Naprosyn, 500 milligrams twice a day for two weeks, and Parafon Forte four times a day for 10 days. Dr. Sharp again examined plaintiff on April 3 and found minimal muscle spasm. He diagnosed Hall with cervical and lumbar strain and ordered x-rays of plaintiff's cervical and lumbar spine. The x-rays were performed on April 4. The x-rays showed that Hall's lumbar and cervical vertebrae and interspaces appeared to be within normal limits. The findings were reported to plaintiff by Dr. Sharp on April 17. At that examination, plaintiff complained of recurrent back pain. Dr. Sharp diagnosed musculoskeletal pain and prescribed Ibuprofen and Parafon Forte for a period of two weeks.

Dr. Sharp again saw Hall on May 15, 1996. Hall reported persistent low back pain. Dr. Sharp's examination revealed no radicular sign and negative neurological examination findings. Dr. Sharp prescribed Parafon Forte, four times a day for two weeks, as well as Amitriptyline[5] once a day indefinitely. Hall was seen again on May 28, reporting that his lower back had improved but was now worse. There was no change in the physical findings. Hall's dosage of Amitriptyline was increased from 25 to 50 milligrams a day, and he was given another two-week course of Parafon Forte. On July 10, 1996, Dr. Sharp examined Hall, who complained of low back pain and intermittent numbness in his leg. Dr. Sharp scheduled plaintiff for an MRI of his lumbosacral spine on August 21. Hall was seen again by Dr. Sharp on August 7 complaining of back pain. The physical examination revealed no change. Plaintiff's MRI, as evaluated by Dr. Robert Akenhead, showed:

> The alignment of the vertebral bodies is satisfactory. Intervertebral disc space height is well maintained. Signal [illegible] from the disc spaces and vertebral bodies is satisfactory. The [illegible] is at the

---

[5] Amitriptyline is an antidepressant with sedative properties. *Id.*

4

> T-12 level and is normal in appearance. The distribution of the nerve
> roots within the thecal sac is satisfactory. No evidence of focal disc
> herniation, spinal stenosis or foraminal stenosis is seen.

Dr. Akenhead's impression was a normal MRI of the lumbar spine. The negative MRI findings were reported to plaintiff at an appointment with Dr. Sharp on August 23. Dr. Sharp wrote in his notes "no evidence of disc disease" and determined that plaintiff suffered from chronic lumbar strain. He continued plaintiff on 500 milligrams of Naprosyn twice a day and discontinued the Amitriptyline.

On September 5, 1996, Hall came to Nurse King complaining that his left side felt like it was on fire, his neck hurt to his hairline, and that he had some numbness and tingling in his right arm. Nurse King reminded plaintiff that his x-rays and MRI were negative for any abnormal findings and advised plaintiff that he could have his family make an appointment with another doctor for a second opinion. Dr. Sharp again examined Hall on September 18 for his continued complaint of back pain. Hall reported to Dr. Sharp that the anti-inflammatory medication was not effective. Dr. Sharp performed a physical examination, with negative findings. He changed Hall's medication to 600 milligrams of Ibuprofen three times a day. Also on September 18, Nurse King noted that Hall had not been taking his prescribed medication.

Dr. Sharp, in an effort to rule out a urinary tract infection, ordered a urinalysis for plaintiff on or about September 19. The urinalysis was negative for any findings. Dr. Sharp's last visit with plaintiff was October 16, 1996. At that time, Hall continued to complain of lower back pain. Dr. Sharp's impression was that Hall suffered from chronic lower back pain. He prescribed 200 milligrams twice day of Clinoril[6] and that plaintiff be moved to a bottom bunk.

---

[6] Clinoril is a nonsteroidal anti-inflammatory drug with analgesic properties. It is indicated for acute or long-term use in the relief of osteoarthritis, rheumatoid arthritis, ankylosing spondylitis, acute painful shoulder due to bursitis or tendinitis, and acute gouty arthritis. *Id.*

5

Plaintiff's medication records show that he received the prescribed dosage of Amitriptyline from May 29 to June 8, June 27 to July 9, July 12 to July 15, and July 19 to August 20, 1996.[7] On August 1, 1996, Nurse King ordered plaintiff's medical records from Crestwood Hospital regarding his 1995 treatment for complaints of back pain. The records show that he first complained of back pain from a pulled muscle on September 5, 1995. He was given Tylenol, Motrin, and Toradol[8] for the pain. The diagnosis was back strain. He returned on September 8 and received a prescription for Lortab (5 mg tablets)[9] and Naprosyn. He declined an x-ray at this time. In October 1995, Hall consented to an x-ray, which showed a normal lumbar spine. Hall was given Lortab and Naprosyn on September 5. Plaintiff returned to the Crestwood Hospital emergency room on November 2, 1995. He complained of continuing low back pain as a result of heavy lifting. The straight leg reflex test was positive on his right side. The doctor diagnosed lumbosacral sprain and muscle spasm. Hall was given 20 Lortabs to be taken four times a day and 24 Flexeril[10] to be taken three times a day for muscle spasm. Hall returned to the emergency room on November 6, complaining of lower back pain and reporting he had taken the last of his pain medication the day before. The doctor prescribed 12 more Lortab tablets and 60 500-milligram tablets of Naprosyn. Hall was given a referral to an

---

[7] It appears the medication records provided to the court are incomplete in light of the prescriptions by Dr. Sharp reported in his medical records.

[8] Toradol is a nonsteroidal anti-inflammatory medication prescribed for short-term management of pain. *Physicians' Desk Reference*, 46th Ed. (1992).

[9] Lortab 5 tablets contain 5 milligrams of hydrocodone bitartrate, a potentially habit-forming medication, and 500 milligrams of acetaminophen. Lortab is prescribed for relief of moderate to moderately severe pain. *Id.*

[10] Flexeril is prescribed for relief of muscle spasms associated with acute, painful musculoskeletal conditions. *Id.*

6

orthopedic physician in the event the pain had not improved in a few days. There were no further medical records.

## DISCUSSION

### Summary Judgment Standard

This matter proceeds before the court pursuant to the provisions of Rule 56, Fed. R. Civ. P. Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Rule 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106 S. Ct. 2505, 2509-10, 91 L.Ed.2d 202 (1986). Thus, summary judgment is appropriate where the non-movant "fails to make a showing sufficient to establish the existence of an essential element to that party's case, and on which that party will bear the burden or proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 332, 106 S. Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). The substantive law governing the action determines whether an element is essential. *Liberty Lobby*, 477 U.S. at 248, 106 S. Ct. at 2510. A party seeking summary judgment always bears the initial responsibility of informing the district court that the basis for its motion, identifying those portions of the pleading, depositions, answers to interrogatories, and admissions on file, if any, which it believes demonstrate the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323, 106 S. Ct. at 2553; *see Brown v. Crawford*, 906 F.2d 667, 669 (11th Cir. 1990), *cert. denied*, 500 U.S. 933, 111 S. Ct. 2056, 114 L.Ed.2d 461 (1991).

This circuit clearly holds that summary judgment should be entered when the moving party has sustained its burden of showing the absence of a genuine issue of material fact when all the

7

evidence is viewed in the light most favorable to the non-moving party, *Sweat v. Miller Brewing Co.*, 708 F.2d 655 (11th Cir. 1983); *see also, Matsushita Electrical Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S. Ct. 1348, 89 L.Ed.2d 538 (1986). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252, 106 S. Ct. at 2512, 91 L.Ed.2d at 214. The evidence of the non-movant is to be believed and all justifiable inferences are to be drawn in his favor. *Id.* at 255, 106 S. Ct. at 2514, *citing Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 158-59, 90 S. Ct. 1598, 1608-09, 26 L.Ed.2d 142 (1970). It is, therefore, under this standard that the court must determine whether the plaintiff can meet his burden of coming forward with sufficient evidence as to each material element of his claim sufficient to permit a reasonable jury to find in his favor.

## Medical Care Claim

The United States Supreme Court has held that it is only deliberate indifference to serious medical needs of prisoners which will give rise to a claim of cruel and unusual punishment in violation of the Eighth Amendment. *Estelle v. Gamble*, 429 U.S. 97, 97 S. Ct 285, 50 L.Ed.2d 251 (1976). Mere negligence is insufficient to support a constitutional claim. *Fielder v. Bosshard*, 590 F.2d 105 (5th Cir. 1979). An accidental or inadvertent failure to provide medical care, or negligent diagnosis or treatment of a medical condition, does not constitute a wrong under the Eighth Amendment. *See Ramos v. Lamm*, 639 F.2d 559 (10th Cir. 1980), *cert. denied*, 450 U.S. 1041 (1981). The court must first determine whether there was evidence of a serious medical need. If so, the court must then consider whether the defendants' response to that need amounted to deliberate indifference. *Mandel*

8

*v. Doe*, 888 F.2d 783 (11th Cir. 1989). A mere difference of opinion between an inmate and the institution's medical staff as to diagnosis and treatment will not alone give rise to a cause of action under the Eighth Amendment. *Smart v. Villar*, 547 F.2d 112 (10th Cir. 1976). *See also Estelle v. Gamble, supra*, at 106-08. Under *Farmer v. Brennan*, 511 U.S. 825, 114 S.Ct. 1970, 1979, 128 L.Ed.2d 811 (1994), a prisoner must establish that the defendants were "aware of facts from which the inference could be drawn that a substantial risk of harm exists" and also drew the inference. Being aware a prisoner reports pain is some distance from being aware of a substantial risk of harm; many reports may be false, and most true reports of pain do not imply a substantial risk of harm from delay. It must also be shown that the defendant failed to act despite his actual knowledge of a substantial risk of serious harm. *Id.* at 841-42, 114 S.Ct. at 1981. *Farmer* focuses on the actor's state of mind, a subjective inquiry.

Plaintiff's medical records affirmatively demonstrate the defendants have not been deliberately indifferent to plaintiff's complaints of back pain. Hall was examined on numerous occasions by Nurse King and Dr. Sharp. Different medications were tried in an attempt to find one that would alleviate his pain. All physical examinations were negative for any indications of spine injury. Dr. Sharp ordered x-rays and an MRI for Hall. The x-rays and MRI also failed to reveal any physical cause for plaintiff's complaints of pain. Hall's claims against Nurse King and Dr. Sharp amount to nothing more than a disagreement over his diagnosis and course of treatment, and such claims are not actionable under 42 U.S.C. § 1983.

JAN-30-1998 17:58   USDC HUNTSVILLE   205 551 0741   P.012/020

### Protection from Other Prisoners

Convicted prisoners are entitled to the protection of the Eighth Amendment, which prohibits cruel and unusual punishment. While pretrial detainees are protected by the Fourteenth Amendment, the standard of review is the same as for inquiries under the Eighth Amendment. *Hamm v. DeKalb County*, 774 F.2d 1567 (11th Cir. 1985). When officials become aware of a threat to an inmate's health or safety, the Eighth Amendment imposes a duty to provide reasonable protection. *Hopkins v. Britton*, 742 F.2d 1308, 1310 (11th Cir. 1984); *Gullatte v. Potts*, 654 F.2d 1007, 1012 (5th Cir. 1991). A merely negligent failure to protect an inmate from attack, however, does not justify liability under § 1983. *Daniels v. Williams*, 474 U.S. 327, 328, 106 S. Ct. 662, 663, 88 L.Ed.2d 662 (1986). Prison officials must have been deliberately indifferent to a known danger before their failure to intervene offends the "the evolving standards of decency" giving rise to a constitutional tort. *Estelle v. Gamble*, 429 U.S. 97, 105-06, 97 S. Ct. 285, 291-92, 50 L.Ed.2d 251 (1976); *Hopkins*, 742 F.2d at 1310. The known risk of injury must be "'a strong likelihood rather than a mere possibility'" before a prison official's failure to act can constitute deliberate indifference. *Edwards v. Gilbert*, 867 F.2d 1271, 1276 (11th Cir. 1989) (quoting *State Bank of St. Charles v. Camic*, 712 F.2d 1140, 1146 (7th Cir. 1983)).

In *Farmer v. Brennan*, *supra*, the Supreme Court adopted a "subjective recklessness" standard so that a prison official is not deliberately indifferent unless the individual "knows and disregards an excessive risk to inmate health and safety; that official must both be aware of the facts from which the inference would be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* at 837, 114 S. Ct. at 1979. The Supreme Court did not determine in *Farmer* at what point a risk of inmate assault becomes substantial enough to be considered a

10

deprivation of the prisoner's Eighth Amendment rights. *Id.* at 834 n. 3, 114 S. Ct. at 1977 n. 3. The Court did state that "[f]or a claim (like the one here) based upon a failure to prevent harm, the inmate must show that he is incarcerated under conditions posing a <u>substantial risk of serious harm</u>." (emphasis added) *Id.* At 834, 114 S.Ct. At 1977. A defendant in the instant lawsuit may be liable for money damages only if he had specific knowledge that Don Crafts posed an imminent risk of harm to plaintiff and deliberately disregarded the danger while possessing the ability to prevent the assault. *Brown v. Hughes*, 894 F.2d 153 (11th Cir. 1990).

Plaintiff has not demonstrated that defendant Whisante was aware, prior to Crafts' assault on plaintiff, that Crafts posed a risk or threat of harm to plaintiff. Plaintiff has alleged in his complaint that Crafts had "flipped out" while incarcerated at Annex 1; however, he offers no substantiating proof nor any evidence that jail officials should have been alerted that Crafts posed a risk of harm to plaintiff. Therefore, the court concludes that plaintiff is not entitled to relief on this claim.

Plaintiff is also not entitled to relief against defendant Whisante on any claim in this action because he makes his claims against Whisante in his supervisory capacity. He makes no allegation that Whisante was personally involved in any of the events made the basis of this action. Instead, he simply alleges that Whisante is liable because he is responsible for the care, health, safety, and well being of inmates in the jail. Hall simply attempts to implicate defendant Whisante through the concept of *respondeat superior*. However, the doctrine of *respondeat superior* is not available to a plaintiff under § 1983. *Monell v. Department of Social Services*, 436 U.S. 658 (1978). Absent some allegation that Whisante knew of, sanctioned, or participated in or was otherwise "affirmatively linked" to the acts complained of, the complaint is insufficient to state a cause of action under 42 U.S.C. § 1983. *See Gilmere v. City of Atlanta, Georgia*, 774 F.2d 1495 (11th Cir. 1985), *cert.*

*denied,* 476 U.S. 1115 (1986). The uncontroverted affidavit of defendant Whisante establishes that he was not personally involved in the incident between plaintiff, Hall, and Crafts nor in any decision regarding plaintiff's medical treatment.

Based on the foregoing, the court concludes that defendants' motion for summary judgment is due to be **GRANTED** and this action **DISMISSED**.

**DONE** this 30th day of January, 1998.

_____
LYNWOOD SMITH, JR.
UNITED STATES DISTRICT JUDGE

